**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**

**ALBANY DIVISION**

| | |
|---|---|
| **Palmyra Park Hospital, Inc.,** ) | |
| **d/b/a Palmyra Medical Center,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | |
| **v.** ) | **File No.** |
| ) | |
| ) | |
| **Phoebe Putney Memorial Hospital, Inc.;** ) | |
| **Phoebe Putney Health System, Inc.; and** ) | |
| **Hospital Authority of Albany/** ) | |
| **Dougherty County,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff Palmyra Park Hospital, Inc., d/b/a Palmyra Medical Center ("Palmyra"), brings this action to recover damages and to obtain declaratory, injunctive, and other equitable relief for violations of federal and Georgia law by Defendants Phoebe Putney Memorial Hospital, Inc.; Phoebe Putney Health System, Inc.; and the Hospital Authority of Albany/Dougherty County.

### Summary of this Case

1.     In and around Dougherty County, Georgia, healthcare costs are substantially higher than elsewhere in the state and region. Health insurance companies and employers have recognized this problem. Studies have confirmed it. Local government has sought in vain to address it.

2.     The reason is simple.  For years the Defendants in this case have used their monopolies in obstetrics, neonatology, and cardiovascular care to foreclose competition in other hospital services, and to exclude Palmyra from the market.  As a result, Defendants have been able to, and do, charge commercial insurers, claim administrators and commercially insured patients more than a competitive marketplace would allow.  Palmyra, the only other hospital in town, has been willing and able to offer competitive prices for cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary, urology, and other hospital services.  Defendants have, however, consistently used their monopoly power to prevent commercially insured residents of Dougherty and the surrounding counties from being able to use Palmyra.

3.     Over the years, Defendants have employed a variety of tactics to further their anticompetitive scheme, including but not limited to:

a.     using their monopoly power to enshrine Phoebe Putney as the only local authorized provider of *all* hospital services for Georgians insured by Blue Cross Blue Shield of Georgia ("BCBSGA") or by companies for which BCBSGA serves as the claim administrator;

b.     excluding Palmyra from the network of hospitals eligible to serve employees insured through the Albany/Dougherty County Public Employees' Healthcare Plan ("Public Employees' Plan"); and

c.     coercing other commercial insurers and claim administrators to exclude Palmyra from the network of hospitals potentially open to state employees insured under Georgia's State Health Benefit Plan.

4.     By effectively confining commercially insured patients in southwest Georgia to a single local hospital option, Defendants have hindered competition and raised the hospital costs that commercial insurers, employers and patients must pay.  Compounding the injury, these higher healthcare costs restrain the growth -- or worse, could force the relocation -- of employers capable of providing solid, middle-class jobs to the region.  Because enough is enough, this lawsuit seeks to break the stranglehold that Defendants have on local hospital services, and to restore hospital competition to the region.

### Parties and Related Entities

5.     Palmyra owns and operates a 248-bed acute-care hospital in Albany, Georgia that it built in 1971 in response to requests by local physicians and community leaders to broaden the healthcare options open to residents of Dougherty and the surrounding counties.  Palmyra provides primary and secondary acute-care services, including but not limited to services in cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary care, and urology.

6.     Phoebe Putney Memorial Hospital, Inc. ("PPMH"), a Georgia not-for-profit organization that maintains its principal place of business in Albany, Georgia, operates Phoebe Putney Memorial Hospital, a 443-bed acute-care hospital also located in Albany.  Founded in 1911, Phoebe Putney is by far the largest hospital in southwest Georgia.  Among other services, Phoebe Putney offers acute-care obstetrics, neonatology, and cardiovascular services, for which it is practically the only provider in the geographic market.  Until recently, the state regulatory structure has ensured Phoebe Putney's continued dominance in these services.  In addition, Phoebe Putney provides other acute-care services, many of which Palmyra is prepared to compete with in the geographic market.

3

7.      A creation of Georgia's Hospital Authorities Law, O.C.G.A. §§ 31-7-70 *et seq*., the Hospital Authority of Albany/Dougherty County maintains its principal place of business in Albany, Georgia.  The Hospital Authority owns the Phoebe Putney's assets, but leases them to PPMH under a long-term Lease and Transfer Agreement (the "Lease") dated December 11, 1990.  Exhibit A.  Under the Lease, PPMH has controlled the assets of, and operations at, Phoebe Putney for over 15 years.  PPMH pays for the maintenance required at Phoebe Putney; hires and fires all employees; establishes procedures to appoint, reappoint, suspend or terminate medical staff privileges; and on its own or through agents negotiates all relationships with managed-care organizations.  The Hospital Authority cannot countermand, approve or revise PPMH's decisions in these and other management areas during the term of the Lease.  PPMH, in short, controls all assets and operations at Phoebe Putney.

8.      Although the Lease does not expire until 2042, the Hospital Authority retains the right to terminate the Lease and to reassert control over the Phoebe Putney's operations before then, under certain designated circumstances.  Despite knowing that the other Defendants have engaged in anticompetitive behavior in violation of the antitrust laws, and on that basis having the right under the Lease to reassert control over Phoebe Putney's operations and end the anticompetitive behavior, the Hospital Authority has not exercised its right to terminate the Lease or otherwise take over Phoebe Putney's management.  In this way the Hospital Authority has furthered the anticompetitive scheme described below.

9.      Neither Georgia's Hospital Authorities Law nor the Lease sets forth a policy of non-competition for hospital services.

10.      Phoebe Putney Health System, Inc. ("PPHS"), a Georgia not-for-profit organization, is the corporate parent of PPMH and a number of affiliated organizations,

including Phoebe Worth Medical Center, Inc.; Phoebe Foundation, Inc.; and Phoebe Health Ventures, Inc.  PPHS exerts *de facto* control over and provides overall guidance, direction and resource allocation to PPMH and its affiliate organizations.  By failing to exert proper control over PPMH, PPHS has furthered the anticompetitive scheme described below.  PPHS too maintains its principal place of business in Albany, Georgia.

11.     Non-party Phoebe Health Partners, Inc. ("PHP") is a not-for-profit physician hospital organization that Defendants have formed with groups of independent and competing physicians to fix fee schedules and negotiate managed-care contracts with commercial insurers and claim administrators.  PHP is incorporated in Georgia, and maintains its principal place of business in Albany, Georgia as well.  As agent for PPMH, PHP has negotiated and executed managed-care contracts for hospital services with commercial insurers and claim administrators.  PPMH and its parent, PPHS, have a 50 percent controlling interest in PHP, and dictate the terms and conditions on which PHP permits commercial insurers and claim administrators access to Phoebe Putney.

### Jurisdiction and Venue

12.     Palmyra brings this action under:  a) Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26) as a result of Defendants' violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2); and b) Georgia law.

13.     This Court has subject-matter jurisdiction over Palmyra's federal claims pursuant to 28 U.S.C. §§ 1331, 1337.  Defendants are engaged in -- and the conduct described in this Complaint has a substantial effect on -- interstate commerce, including the payments of healthcare claims and insurance premiums across state lines.  This Court has pendent jurisdiction over Palmyra's state-law claims pursuant to 28 U.S.C. § 1367.

14.     This Court has personal jurisdiction over Defendants because of their continuous and systematic contacts with this District and Division, including but not limited to their residence in, and ownership and operation of Phoebe Putney and other facilities in and around Albany, Georgia.

15.     Venue is proper in this District and Division under 15 U.S.C. §§ 15, 22 and under 28 U.S.C. § 1391 because Palmyra and Defendants reside, transact business, and are found here.

## The Tying-Product Markets

16.     The tying-product markets for Palmyra's claims are the separate markets for acute-care obstetrics, neonatology, and cardiovascular services provided to commercially insured patients.  Each of these services represents a separate product market because the services are not reasonable substitutes for one another; for example, a patient needing cardiovascular services cannot purchase neonatology services as a substitute.

17.     The tying-product market for acute-care obstetrics services provided to commercially insured patients includes comprehensive pregnancy and childbirth services, including treatment of postpartum conditions.  Georgia law has long required a state-issued Certificate of Need ("CON") to provide these services.  Phoebe Putney has held the requisite CON for these services, while Palmyra has not.

18.     The tying-product market for acute-care neonatology services for commercially insured patients includes comprehensive care for high-risk pregnant women, premature infants and infants born with major complications.  Georgia law has long required a state-issued CON to provide these services.  Phoebe Putney has held the requisite CON for these services, while Palmyra has not.

19.     The tying-product market for acute-care cardiovascular services for commercially insured patients includes cardiac catheterization and catheterization-based cardiovascular procedures, as well as coronary bypass surgery and other cardiothoracic procedures.  Cardiac catheterization involves inserting a catheter into a patient's vein or artery to perform angiographic, physiologic and, as appropriate, therapeutic procedures.  Georgia law has long required a CON to operate a cardiac catheterization laboratory, which is essential to provide commercially competitive cardiovascular services in general.  Phoebe Putney has held the requisite CON for these services, while Palmyra has not.

20.     No other types of acute-care services are reasonably interchangeable with acute-care obstetrics, neonatology, or cardiovascular services and, as alleged above, those services are not reasonably interchangeable with one another.  In addition, under state law and during much of the relevant period, no other services could have been substituted for acute-care obstetrics, neonatology, or cardiovascular services without separate CONs for the provision of obstetrics, neonatology, and cardiac catheterization services.

21.     As alleged in greater detail below, Defendants have achieved and sought to maintain market power in these tying-product markets, and have repeatedly sought to extend that market power into other markets.

22.     Palmyra has twice applied, for example, for CON approval for a cardiac catheterization laboratory.  Both times Defendants opposed Palmyra's applications, and both times the state Department of Community Health ("DCH") denied the applications.

23.     Palmyra has also applied for CON approval for obstetrics services.  Each time, Defendants opposed Palmyra's CON application, and each time DCH denied Palmyra CON approval for obstetrics services.

24.     In April 2008, the Georgia General Assembly passed new legislation amending the CON requirements for several hospital services, including obstetrics and cardiac catheterization services. Under this new legislation, effective July 1, 2008, CON applicants apparently no longer must establish a need for these services in order to gain CON approval and access to the market. These changes, however, do not allow Palmyra the present ability to challenge the long-established dominance in obstetrics, neonatology, and cardiovascular services that Phoebe Putney enjoys.

25.     Other features of the tying-product markets create significant barriers to entry, such as:

a.     the need to house delivery of these tying products within an acute-care hospital capable of providing the necessary support services;

b.     the significant capital investment necessary to establish and deliver the tying products;

c.     the need to generate and maintain sufficient relationships with physicians and nursing staff who can provide the tying products; and

d.     the special accreditation required for the delivery of these tying products.

## The Tied-Product Markets

26.     As described in greater detail below, Defendants have used Phoebe Putney's market power in the tying markets to hinder competition in the separate product markets for certain other acute-care services provided to commercially insured patients (the "tied-product markets"). The tied-product markets include those for acute-care cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary care, and urology services sold to commercially insured patients.

27. The tied-product market for acute-care cardiology includes procedures performed at a hospital relating to the treatment of circulatory disorders, hypertension, chest pain, heart failure, heart murmurs, pacemaker implants, and other disorders of the cardiovascular system -- the heart, arteries, and veins.

28. The tied-product market for acute-care gastroenterology includes procedures performed at a hospital relating to the treatment of ulcers, gastrointestinal hemorrhage or obstruction, inflammatory bowel disease, digestive disorders, and other esophageal or gastrointestinal problems.

29. The tied-product market for acute-care general surgery includes procedures performed at a hospital relating to the head and neck, chest, respiratory system, bowels, stomach, pancreas, liver, breast, skin, soft tissue, and the endocrine system, as well as thyroid procedures, appendectomies, treatment of hernias, surgical procedures for obesity, treatment of trauma and burns, and other surgical procedures.

30. The tied-product market for acute-care gynecology includes procedures performed at a hospital involving the female reproductive system.

31. The tied-product market for medicine services includes treatment and procedures performed at a hospital relating to ear, nose, and throat conditions, connective tissue disorders, back problems, burns, endocrine disorders, eye infections, fevers, allergic reactions, poisoning, and other injuries, conditions and disorders.

32. The tied-product market for acute-care oncology includes procedures performed at a hospital for the treatment of cancer and malignant tumors.

33. The tied-product market for acute-care pulmonary services includes procedures performed at a hospital relating to the treatment of respiratory conditions and chest trauma, including asthma, bronchitis, and pneumonia.

34. The tied-product market for acute-care urology includes procedures performed at a hospital relating to the kidney, bladder, ureter, prostate, and urethra; treatment of urinary tract infections; and procedures involving the male reproductive system.

35. Phoebe Putney's delivery of the tying and tied products to commercially insured patients represents distinct product markets under federal antitrust law because:

    a. Hospital patients can, and do, seek the tied products independently of the tying products. As demonstrated in its own history, Palmyra can compete to provide commercially insured patients with tied products without also providing the tying products -- provided that Defendants do not foreclose that competition by insisting on across-the-board exclusive contracts with commercial insurers and claim administrators.

    b. Hospital patients also can, and do, seek each tied product independently of each other tied product. Each of these services represents a separate product market because the services are not reasonable substitutes for one another; for example, a patient needing oncology services cannot purchase gynecology services as a substitute.

    c. No price elasticity or interchangeability of products exists between services provided to commercially insured patients, on the one hand, and to other patients (*e.g.*, those with government-provided insurance or no insurance at all) on the other hand.

### The Geographic Market

36.     The geographic market for each of the tying and tied products is the ten-county area that includes Dougherty, Calhoun, Worth, Baker, Mitchell, Randolph, Terrell, Lee, Sumter, and Crisp counties.

37.     Phoebe Putney's market power in the delivery of the tying products in this geographic market derives primarily from its must-have status among commercial insurers and claim administrators.  Commercial insurers and claim administrators regard Phoebe Putney as indispensable to the comprehensive healthcare insurance that the commercial insurers and claim administrators must offer employers in the geographic market.  As alleged in greater detail below, without Phoebe Putney as an in-network hospital, a commercial insurer or claim administrator seeking business in the geographic market would have to direct individuals seeking locally delivered obstetrics, neonatology, or cardiovascular services to hospitals outside the region.  The inconvenience and increased health risk posed by having to travel longer distances to receive these services would be unacceptable to employers or consumers, and would put the commercial insurer's or claim administrator's plan at a significant competitive disadvantage.  For this reason, commercial insurers, claim administrators and employers regard Phoebe Putney as a must-have hospital in this geographic market.

38.     Phoebe Putney's share of commercially insured patients using the tying products within the geographic market reflects and reinforces its must-have status.  Other hospitals providing these services have shares of these tying product markets that are, at most, a small fraction of Phoebe Putney's.  In addition, these other hospitals are authorized to provide far fewer beds than Phoebe Putney, and thus cannot easily expand their output of the tying products in response to supracompetitive price increases by Defendants.  These distant second- and third-

place service providers thus do not, and cannot reasonably be expected to, constrain the Phoebe Putney's dominance in the tying markets.

39.     Through Phoebe Putney's market power in the tying markets, Defendants have, as described below, unlawfully constrained competition with Palmyra for each of the tied products in this geographic market.

### The Importance of Managed-Care Contracts to Hospitals

40.     To provide high quality services at competitive prices, and to attract quality physicians, hospitals like Phoebe Putney and Palmyra seek a steady volume of commercially insured patients through contracts with commercial insurers and claim administrators.

41.     Although commercially insured patients are usually free to seek treatment wherever they choose, managed-care contracts between commercial insurers or claim administrators and hospitals provide insured patients with significant financial incentives to seek services from a hospital under contract with their insurer or employer (an "in-network provider").  These incentives include lower co-payments and insurance premiums, and better coverage.

42.     A hospital's designation as an in-network provider also tends to steer commercially insured patients to that hospital.  Employees covered by commercial insurance typically receive information from the insurer about which local hospitals have in-network status.  Absent extraordinary circumstances, these employees tend to seek treatment where they are directed.  When a hospital gains in-network status under a particular insurance plan, it therefore tends to experience an increase in the number of patients covered by that plan who seek services at that hospital.

43. Hospitals without such contracts, or "out-of-network providers," must usually rely more heavily on revenue from government insurers such as Medicare, Medicaid, and the Veterans Administration, which typically reimburse hospitals at lower, non-negotiable rates. To serve the community and compete in their respective markets, hospitals therefore seek in-network status with commercial insurers and claim administrators.

44. Palmyra's experiences with commercial insurers and claim administrators mirror these general tendencies. In 1999, the last full year that Palmyra enjoyed in-network status with BCBSGA, Palmyra realized more than $24 million in gross revenues from BCBSGA-insured and -administered patients. By 2001, after Defendants coerced BCBSGA into accepting an exclusive contract, Palmyra's gross revenues from the same patient pool had fallen to less than $6 million.

**Operation of the Relevant Markets**

45. Upon information and belief, commercial insurers and claim administrators operating in the geographic market believe that they must obtain the tying products from Defendants in order to offer a commercially viable, competitive managed-care plan. Accordingly, Phoebe Putney is a must-have hospital for commercial insurers and claim administrators serving the geographic market.

46. No other hospital within the ten-county area offers reasonable substitutes for the tying products offered by Phoebe Putney. The other hospitals within the geographic market either do not offer the tying products or cannot constrain Defendants' prices for these tying products.

47. For example, according to data from the Georgia Hospital Association ("GHA"), Phoebe Putney regularly captures nearly 70% of the commercially insured obstetrics-patient

13

discharges in the geographic market. Crisp Regional Hospital, a significantly smaller hospital with the second largest share of commercially insured obstetrics-patient discharges in the geographic market, accounts for only about 20% of those discharges. No other hospital reports more than 3% of such discharges in the geographic market.

48.     The same data suggest that Phoebe Putney accounts for over 90% of the commercially insured neonatology-patient discharges, and over 70% of the commercially insured cardiovascular-patient discharges, in the geographic market. Only two or three other hospitals in the geographic market offer neonatology or cardiovascular services. None of those other hospitals appears to account for more than 2% of these discharges.

49.     Moreover, most commercially insured patients residing within the geographic market do not and will not routinely bypass Phoebe Putney to use a hospital outside of the geographic market. For example, GHA data indicate that in 2006 Phoebe Putney reported 44 neonatology discharges of patients residing in the geographic market. Phoebe Putney's closest competitor -- inside or outside of the geographic market -- reported discharging exactly one.

50.     The low voluntary outflow of commercially insured patients beyond the geographic market, commercial insurers' and claim administrators' reluctance or inability to direct area patients away from Phoebe Putney, and the inability of nearby hospitals to accommodate additional patients seeking the tying products all buttress commercial insurers' and claim administrators' view that any commercially viable insurance plan must include access to the tying products offered by Defendants.

### Defendants' Illegal Conduct

51.     Defendants have used their market power in the tying markets to:  a) exclude Palmyra from the tied markets, and b) extend Defendants' dominance across a variety of product

14

lines to capture, according to their own public statements, a market share for all acute-care services exceeding 70%. *See* Exhibit B. Defendants' illegal acts of exclusion account for a significant portion of this dominant market share for all acute-care services.

52. Defendants have exploited the Phoebe Putney's must-have status in the tying markets in multiple ways to foreclose competition in the tied markets. First, since 2000, Defendants have demanded and achieved *de facto* managed-care contracting exclusivity with BCBSGA, which, on information and belief, is by far the largest commercial insurer and claim administrator in the geographic market. On further information and belief, Defendants have accomplished this *de facto* exclusivity by requiring even more generous reimbursement rates from BCBSGA if it enters into a managed-care contract with Palmyra. Phoebe Putney's must-have status has allowed Defendants to re-impose these restrictions each time the BCBSGA contract comes up for renewal, including within the last four years.

53. Palmyra is the Phoebe Putney's closest competitor in the markets for the tied products in terms of distance, facilities, and capacity. No hospital other than Palmyra offers Georgians residing in the geographic market a practical alternative source for the tied products.

54. Since 2000, Palmyra has approached BCBSGA several times -- including in the last four years -- to negotiate a managed-care contract that would grant Palmyra in-network status to provide the tied products and other services to BCBSGA-insured or -administered Georgians. Each and every time, BCBSGA has told Palmyra that BCBSGA's managed-care contract with Defendants precludes it from contracting with Palmyra.

55. Defendants' insistence on a *de facto* exclusive contract in the tied markets as well as the tying markets denies BCBSGA the ability to add Palmyra to its panel of network

providers.  BCBSGA and the Georgians that it insures receive no real benefit in return for accepting the restrictions that Defendants have demanded.

56.     On information and belief, Defendants have similarly used Phoebe Putney's market power in the tying markets to coerce CIGNA Health Care of Georgia, Inc. ("CIGNA") to agree to exclusive managed-care contracts for all acute-care services, including the tied products that Palmyra is prepared to provide on a competitive basis.  Specifically, Defendants have conditioned Phoebe Putney's inclusion in a possible CIGNA-managed State Health Benefit Plan for state employees on that plan's exclusion of Palmyra.  By attempting to cause Palmyra to be excluded from the CIGNA-managed State Health Benefit Plan, Defendants have tied access to Phoebe Putney's dominant obstetrics, neonatology and cardiovascular services to the exclusive purchase of those tied products for which Palmyra could otherwise offer state employees a competitive option.  CIGNA representatives regard access to Phoebe Putney's tying products as so essential to fielding a competitive offer for the State Health Benefit Plan that they have acceded to Defendants' demand.

57.     Neither CIGNA nor the state employees benefit from Palmyra's exclusion. Defendants' conduct, in fact, could force state employees to end longstanding relationships with their current healthcare providers and to accept greater inconvenience in the future, with no compensating benefit either to them or the plan that provides their insurance.

58.     Through their ability to direct the actions of Phoebe Health Partners, PPMH and PPHS have also used Phoebe Putney's market power in the tying markets to coerce commercial insurers and claim administrators to contract for hospital services through Phoebe Health Partners on terms that specifically target Palmyra, and deny it in-network status for the tied markets.

59.     In this way, Defendants secured an expressly exclusive managed-care relationship with the local Public Employees' Plan.  This relationship precludes the Public Employees' Plan from contracting with any other hospital provider within a 60-mile radius of Albany, or with any provider servicing members of the plan who reside within 60 miles of Albany.  *See* Exhibit C. The 60-mile prohibition, however, exempts both Tift Regional Medical Center *and* a "PHP network of providers" that includes several other hospitals within that so-called exclusive area. The Public Employees' Plan, which at first glance appears designed to exclude *all* other hospitals within 60 miles, in fact primarily targets Palmyra, the only other hospital within the geographic market that could pose a competitive threat to Phoebe Putney.

60.     On information and belief, Defendants have recently coerced the Public Employees' Plan to accept additional changes that further prevent members of the Public Employees' Plan from using Palmyra.  These changes include a complete denial of coverage for those members choosing to receive services out of network, such as at Palmyra.

61.     In the various ways described above and in other ways, Defendants have tied access their tying products to Phoebe Putney's explicit or *de facto* exclusive provision of the tied products.

62.     No rational explanation accounts for Defendants' conduct other than a desire to destroy competition with Palmyra.  As explained below, commercial insurers, claim administrators and patients suffer from the lack of competition by having to pay more for their hospital care.  Without Phoebe Putney's market power in the tying markets, Defendants could not demand and obtain terms with commercial insurers and claim administrators that exclude Palmyra from competing in the tied markets.

## The Anticompetitive Effects of Defendants' Conduct

63.     By entering into coercive agreements with BCBSGA, the State Health Benefit Plan, the Public Employees' Plan, and with other commercial insurers and claim administrators, Defendants have exploited Phoebe Putney's market power in the tying products to compel these commercial insurers and claim administrators to extend exclusive in-network status to the tied products as well.  These agreements preclude Palmyra from competing effectively in the tied markets.

64.     The exclusive agreements confer no corresponding benefit to the commercial insurers, claim administrators or the southwest Georgians who depend on the affected insurance plans.  In addition to sacrificing the opportunity to secure another in-network provider, commercial insurers and claim administrators in the geographic market -- and their customers -- pay higher prices for healthcare than do their counterparts elsewhere in the United States, the Southeast or other parts of Georgia.  A study sponsored by three of Dougherty County's largest employers, in fact, shows that their average healthcare costs per employee within the geographic market exceed the national average by $1,400, and the average for all industry and manufacturing employees in the southeastern U.S. by $2,300.  *See* Exhibit D.  On information and belief, Dougherty County employers have also determined that healthcare costs attributable to Defendants exceed those incurred in other parts of Georgia.

65.     The study's findings are not surprising.  Defendants do not grant commercial insurers and claim administrators any genuine discounts in their agreements.  Instead, Defendants typically force commercial insurers and claim administrators to agree to pay a specified portion of billed charges with no cap on the levels of these charges -- and therefore no contractual limit on Defendants' reimbursements.

66.     The effects of Defendants' anticompetitive actions are devastating to Georgians. With only two hospitals authorized for more than 200 beds in the geographic market, limited competitive alternatives are available to residents seeking the tied products.  Defendants' insistence on exclusive agreements limits commercially insured residents even more, rides roughshod over their physician and other healthcare-provider preferences, and restricts patients' ability to compare quality and pricing at the two hospitals.

67.     Defendants' exclusive managed-care contracts have also stifled the development and expansion of products and services in the geographic market.  For example, from 1997 until 2000, Palmyra contracted with BCBSGA to grant Palmyra in-network status on a non-exclusive basis.  Palmyra's relationship with BCBSGA eventually became a significant and sustained source of revenue for Palmyra, accounting for more than $24 million, or nearly 20% of Palmyra's gross revenue, in 1999.  As a result of Defendants' anticompetitive conduct, Palmyra no longer has the opportunity to compete for BCBSGA-derived revenue that can, even at competitive levels, help to subsidize healthcare delivery to under-insured or uninsured patients, expand and improve services, and attract specialists to the area to better meet physician need.

68.     Defendants' anticompetitive conduct has also harmed the local economy. Because of Phoebe Putney's must-have status and Defendants' resulting leverage over commercial insurers and claim administrators like BCBSGA and CIGNA, Defendants have been able to demand unusually high reimbursement rates from the commercial insurers and claim administrators.  As a result, the commercial insurers and claim administrators must charge higher premiums than they otherwise would, which the large employers in and around Albany must pay or pass on to their employees.  Those higher healthcare costs contribute to lower revenues for

companies located in Albany, and thus lead to less economic growth for the city and surrounding areas.

69.     In addition to the anticompetitive effects on the tied product markets, Palmyra's inability to compete in these markets for a highly desirable patient pool has deprived Palmyra of significant and demonstrable net revenue since 2004.  Palmyra's injury is a direct and immediate consequence of Defendants' illegal acts, and a necessary prerequisite to the injury suffered by commercial insurers, claim administrators, and the Georgians who rely on them.

### Count One:
### Per-Se Violation of Section 1 of the Sherman Act

70.     Palmyra realleges paragraphs 1 through 69.

71.     Defendants possess market power in the tying markets as demonstrated by Phoebe Putney's must-have status, high market share, actual exclusion of competition and control over prices.

72.     Defendants have used their market power in the tying markets to coerce commercial insurers and claim administrators into entering into exclusive contracts that deny Palmyra the opportunity to compete for commercial insurers, claim administrators and commercially insured patients seeking access to the tied markets.

73.     The exclusive contracts described above have unlawfully injured competition and affected a substantial amount of interstate commerce by, among other things, raising prices and unreasonably restricting the competitive hospital alternatives available to insurers, claim administrators and commercially insured patients seeking access to the tied markets.

74.     As a direct result of Defendants' actions, Palmyra has suffered injury by being foreclosed from the tied markets.  As the kind of injury that the antitrust laws were intended to protect against, Palmyra's injury constitutes antitrust injury.

75.     Defendants have thus violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Count Two:**
**Rule-of-Reason Violation of Section 1 of the Sherman Act**

76.     Palmyra realleges paragraphs 1 through 75.

77.     Defendants have excluded competition and unreasonably restrained interstate commerce in the tied markets by coercing managed-care commercial insurers and claim administrators to enter into exclusive managed-care contracts that foreclose competition for the tied products.

78.     This foreclosure has adversely affected competition in the tied markets and thereby affected a substantial amount of interstate commerce.  Defendants charge insurers and commercially insured patients more for tied products than a competitive market would allow, and patients have fewer choices for these services.  Moreover, Defendants' exclusive arrangements with commercial insurers and claim administrators prevent Palmyra from offering lower prices to these insurers, claim administrators, and patients.

79.     Defendants' conduct has no pro-competitive benefit or justification.  The anti-competition effects of their behavior outweigh any purported pro-competitive justifications.

80.     As a direct result of Defendants' actions, Palmyra has suffered injury by being foreclosed from the tied markets.  As the kind of injury that the antitrust laws were intended to protect against, Palmyra's injury constitutes antitrust injury.

81.     Defendants have thus violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Count Three:**
**Violation of Section 2 of the Sherman Act - Monopolization**

82.     Palmyra realleges paragraphs 1 through 81.

83. As demonstrated by Phoebe Putney's must-have status, high market share, and actual exclusion of competition and control over prices, Defendants have monopolized the tied markets.

84. Defendants have achieved and maintained their monopolies through, among other things, coercive exclusive agreements with managed-care commercial insurers and claim administrators that affect an overwhelming majority of the commercially insured lives in the geographic market.

85. Defendants' actions have directly insulated them from competition from Palmyra in the tied markets to the detriment of Palmyra, commercial insurers and claim administrators, and patients.

86. Defendants have not used the least restrictive means to achieve any legitimate business purpose through their conduct. The anti-competitive harm from Defendants' actions outweighs any purported pro-competitive benefits. Any ostensible business justification for Defendants' actions is a mere pretext for their illegal monopolization.

87. Defendants' conduct has directly and proximately caused injury to Palmyra's business and property. As the kind of injury that the antitrust laws were intended to protect against, Palmyra's injury constitutes antitrust injury.

88. Defendants' monopolization has unlawfully hindered competition, and adversely affected business activities in interstate commerce, by raising prices, unreasonably restricting the competitive hospital alternatives available to commercially insured patients, and harming competition in the tied markets.

89. Defendants have thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

**Count Four:**
**Violation of Section 2 of the Sherman Act - Attempted Monopolization**

90.     Palmyra realleges paragraphs 1 through 89.

91.     Defendants have attempted to monopolize the tied markets by, among other things, using their market power in the tying markets to coerce managed-care commercial insurers and claim administrators to agree to exclusive managed-care contracts for the tied services as well.

92.     Defendants have entered into these exclusive agreements, and acted in the other ways described above, with the specific intent to monopolize the tied markets.

93.     A dangerous probability exists that Defendants will monopolize the tied markets because of commercial insurers' and claim administrators' perception of Phoebe Putney as a must-have hospital, that hospital's high market share in the tying markets, the significant barriers to entry in the tying markets, and Defendants' insistence on exclusive contracts with commercial insurers and claim administrators.

94.     Defendants have not used the least restrictive means to achieve any legitimate business purpose through their conduct.  The anticompetitive harm from Defendants' actions outweighs any purported pro-competitive benefits.  Any ostensible business justification for Defendants' actions is a mere pretext for their illegal attempt to monopolize the tied markets.

95.     Defendants' conduct has directly and proximately caused injury to Palmyra's business and property.  As the kind of injury that the antitrust laws were intended to protect against, Palmyra's injury constitutes antitrust injury.

96.     Defendants have thus violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

### Count Five:
### Tortious Interference with Business Relations

97.     Palmyra realleges paragraphs 1 through 96.

98.     Defendants' targeting of Palmyra for exclusion from the tied markets through their exclusive contracts with commercial insurers and claim administrators is improper. Defendants enjoy no privilege that allows them to behave in such a manner.

99.     Defendants acted purposely and with the intent to injure Palmyra.

100.    Through their exclusive agreements, Defendants induced commercial insurers and claim administrators not to enter into or continue business relationships with Palmyra.

101.    Defendants' conduct has directly and proximately caused injury to Palmyra's business and property.

### Count Six:
### Violations of the Georgia Constitution and Georgia State Law

102.    Palmyra realleges paragraphs 1 through 101.

103.    As alleged above, Defendants have engaged in exclusive contracts that defeat and lessen competition, and encourage a monopoly.  Defendants' actions thus violate Article 3, Section 6, Paragraph 5 of the Georgia Constitution and O.C.G.A. § 13-8-2.

104.    Upon information and belief, Defendants' exclusive contracts specifically and purposely prevent Palmyra from entering into competitive contracts with commercial insurers and claim administrators.

105.    Defendants possess monopoly power in the tying markets as demonstrated by their hospital's must-have status, its high market share, Defendants' exclusion of competition and their control over prices.

106.    Defendants' monopoly power in the tied markets has been willfully and wrongfully achieved, maintained, and advanced by their exclusive agreements with commercial

24

insurers and claim administrators who control an overwhelming majority of the commercially insured lives in the tied markets.

107.    Defendants' agreements and practices have directly insulated them from competition in the tied markets to the detriment of Palmyra, commercial insurers and claim administrators, and patients.

108.    Defendants have not used the least restrictive means to achieve any legitimate business purpose through their conduct.  The anticompetitive harm from Defendants' actions outweighs any purported pro-competitive benefits.  Any ostensible business justification for Defendants' actions is a mere pretext for their illegal attempt to monopolize the tied markets.

109.    Defendants' conduct has directly and proximately caused injury to Palmyra's business and property.

### Jury Demand

110.  Palmyra demands a jury trial on all triable issues.

### Prayer for Relief

WHEREFORE, Palmyra prays:

a.    For monetary damages against all Defendants except for the Hospital Authority, and in an amount to be proven at trial.

b.    For Counts One through Four and against all Defendants except for the Hospital Authority, for trebling the amount of damages suffered, for reasonable attorneys' fees, costs of suit, and such other relief as may be proper.

c.    For an injunction prohibiting all Defendants from excluding Palmyra from contracts with commercial insurers and claim administrators.

     d.     For a declaration that Defendants' exclusive contracts with insurers and

claim administrators, whether entered into directly or through intermediaries, are invalid.


Dated this 3rd day of July, 2008.

                    Respectfully submitted,

                    William H. Hedrick
                    127 North Westover Boulevard
                    Albany, Georgia 31707
                    (229) 883-7463
                    (229) 434-1581 (fax)


                    By:     <u>s/William H. Hedrick</u>
                              William H. Hedrick
                              Georgia Bar No. 343250


                    KING & SPALDING, LLP
                    1180 Peachtree Street NE
                    Atlanta, Georgia 30309
                    (404) 572-4600
                    (404) 572-5100 (fax)


                    By:     <u>s/M. Russell Wofford, Jr.</u>
                              M. Russell Wofford, Jr.
                              Georgia Bar No. 773002
                              Christine A. Hopkinson
                              Georgia Bar No. 142106
                              *(Application for admission pending)*


                    *Attorneys for Palmyra Park Hospital, Inc.,*
                    *d/b/a Palmyra Medical Center*

**OF COUNSEL:**

Jeffrey S. Spigel
Miriti Murungi
KING & SPALDING, LLP
1700 Pennsylvania Ave
NW, Suite 200
Washington, D.C. 20006-2706
(202) 737-0500
(202) 626-3737 (fax)

*Attorneys for Palmyra Park Hospital, Inc.,*
*d/b/a Palmyra Medical Center*