[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 29, 2010
JOHN LEY
CLERK

No. 09-11818

D. C. Docket No. 08-00102-CV-WLS-1

PALMYRA PARK HOSPITAL INC,

Plaintiff-Appellant,

versus

PHOEBE PUTNEY MEMORIAL HOSPITAL,
PHOEBE PUTNEY HEALTH SYSTEM INC,
HOSPITAL AUTHORITY OF ALBANY / DOUGHERTY COUNTY,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Georgia

(April 29, 2010)

Before TJOFLAT, PRYOR and MARTIN, Circuit Judges.

TJOFLAT, Circuit Judge:

This is an antitrust case between two competing Georgia hospitals. Palmyra Park Hospital, Inc. ("Palmyra") claims that Phoebe Putney Memorial Hospital ("Phoebe Putney") leveraged a state-granted monopoly in certain medical services to tie favorable insurance reimbursement rates for those services to a refusal to include Palmyra, who competes with Phoebe Putney for the other medical services, in insurance companies' provider networks. The district court dismissed Palmyra's claims due to lack of antitrust standing. Specifically, the district court held that Palmyra was not an efficient enforcer of the antitrust laws. We disagree; Palmyra has antitrust standing to pursue its claims. We accordingly reverse the district court's judgment and remand the case for further proceedings.

## I.

We begin in subpart A by setting out the basic facts, as they are alleged in Palmyra's complaint, viewing them in the light most favorable to Palmyra, as we must at this juncture in the litigation. See Glover v. Liggett Group, Inc., 459 F.3d 1304, 1308 (11th Cir. 2006) (per curiam). In subpart B, we detail the proceedings in the district court.

## A.

Palmyra operates a 248-bed hospital in Albany, Georgia, which is located in Dougherty County. The hospital, built in 1971, is a for-profit institution. Phoebe

Putney operates a not-for-profit, 443-bed hospital in Albany. Built in 1911, this hospital is the largest in the region. Phoebe Putney is a wholly owned subsidiary of Phoebe Putney Health Systems, Inc., also a not-for-profit institution. Phoebe Putney's assets are owned by the Hospital Authority of Albany/Dougherty County, which leases the assets to Phoebe Putney on a long-term basis,[1] but has no control over Phoebe Putney's operations. Palmyra is Phoebe Putney's largest and chief competitor for acute-care services in the region.[2]

The two hospitals offer a number of the same acute-care services—cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary care, and urology. To provide certain services, a hospital must obtain a Certificate of Need ("CON") from the state. Phoebe Putney has a CON for acute-care obstetrics, neonatology, and a cardiac catheterization laboratory. Palmyra does not possess these CONs and thus does not provide these services. The few other hospitals in the region that do provide them do so on such a smaller scale that they do not meaningfully compete with Phoebe Putney.

Hospitals like Palmyra and Phoebe Putney derive a large amount of their revenue from private insurers. Hospitals negotiate contracts with private insurers

---

[1] Each county in Georgia has a hospital authority, see O.C.G.A. § 31-7-72, which (among other functions) owns and leases land and buildings for use as hospitals, id. § 31-7-75.

[2] According to the complaint, Palmyra and Phoebe Putney are the only hospitals in the area authorized to have more than two hundred beds.

3

that set the rates the insurers will pay for services the hospital provides the insured patients. A hospital with such a contract is considered an in-network provider, and an insurer provides its policy holders with strong financial incentives—usually in the form of lower co-payments or lower insurance premiums—to procure medical services from in-network instead of out-of-network providers. These incentives are strong enough that policy holders tend to choose only in-network hospitals, and hospitals can expect an increase in the number of an insurer's policy holders who choose it for medical services when the hospital becomes an in-network provider for that insurer. The converse also holds true: hospitals can expect to lose much of the business of an insurer's policy holders if the hospital loses its status as an in-network provider for that insurer.[3]

To attract policy holders, private insurers must offer a network of hospitals that provides a comprehensive range of services. Therefore, Phoebe Putney's position as the only large area hospital possessing CONs to provide acute-care obstetrics and neonatology services and to operate a cardiac catheterization laboratory means that a private insurer wishing to compete for policy holders in

---

[3] In addition to these contracted-for reimbursements from private insurers, hospitals also derive revenue from government insurers (such as Medicare, Medicaid, and the Veterans Administration), but these sources usually reimburse hospitals at lower, nonnegotiable rates. Hospitals thus prefer to be part of private insurance companies' provider networks.

any meaningful way in southwest Georgia must include Phoebe Putney in its network.

Prior to 2000, Palmyra was an in-network provider for Blue Cross Blue Shield of Georgia ("Blue Cross"), which is the largest private insurer in the region. Sometime in 2000, Palmyra lost its in-network status with Blue Cross. According to Palmyra, this happened because Phoebe Putney leveraged its monopoly power over the medical services requiring CONs to force Blue Cross (and other insurers) to exclude Palmyra from their provider networks. Specifically, Phoebe Putney threatened to demand significantly higher reimbursement rates for those services in its contracts with Blue Cross if Blue Cross included Palmyra in its provider network. Palmyra attempted to contract with Blue Cross on several occasions after 2000, but each time Blue Cross informed Palmyra that Blue Cross could not include Palmyra as an in-network provider because of Blue Cross's contract with Phoebe Putney.

## B.

In July 2008, Palmyra brought this action in the United States District Court for the Middle District of Georgia against Phoebe Putney, Phoebe Putney Health Systems, Inc., and the Hospital Authority of Albany/Dougherty County. Palmyra's complaint alleges that Phoebe Putney has illegal tying agreements with Blue Cross

and a local Public Employees' Plan in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,[4] and that Phoebe Putney Health Systems, Inc. and the Hospital Authority are conspiring with Phoebe Putney in its execution of those tying agreements.[5] The complaint also alleges several related state-law claims.[6]

The complaint sets out the facts described in part I.A. It identifies the geographic market as a ten-county area in southwestern Georgia including Dougherty, Calhoun, Worth, Baker, Mitchell, Randolph, Terrell, Lee, Sumter, and Crisp counties. According to Palmyra, Phoebe Putney is the only hospital in this region with the CONs necessary to provide obstetrics, neonatology, and cardiovascular services, and it would be too costly, time-intensive, or risky for

---

[4] Section 1 of the Sherman Act outlaws "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations" as a felony. 15 U.S.C. § 1. Section 2 declares, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony." 15 U.S.C. § 2.
"A tying arrangement is 'an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.'" Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 461–62, 112 S. Ct. 2072, 2079, 119 L. Ed. 2d 265 (1992) (quoting N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5–6, 78 S. Ct. 514, 518, 2 L. Ed. 2d 545 (1958)). A tying arrangement violates § 1 of the Sherman Act if the seller has market power in the tying product market and the tying arrangement affects a substantial volume of commerce in the tied product market. Id. at 462, 112 S. Ct. at 2079.

[5] Palmyra invoked the district court's subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1337 (antitrust and commerce).

[6] Palmyra brought the state law claims under the district court's supplemental jurisdiction. See 28 U.S.C. § 1367.

patients seeking those services to travel outside the region. The few other hospitals in this region that provide those services (presumably because they also have the requisite CONs) are not authorized to provide enough hospital beds to compete with Phoebe Putney in any meaningful way; Phoebe Putney thus has market power for medical services requiring a CON in this geographic market.

The complaint identifies three separate medical-services product markets in which Phoebe Putney possesses market power due to its CONs: acute-care obstetrics, neonatology, and cardiovascular catheterization services provided to privately insured patients.[7] These three markets constitute the tying-products markets. Palmyra identifies eight separate markets for medical services in which it competes with Phoebe Putney: acute-care cardiology, gastroenterology, general surgery, gynecology, medicine, oncology, pulmonary care, and urology services provided to privately insured patients. These eight markets constitute the tied-products markets. According to Palmyra, there is no cross-price elasticity of demand for any of the separate markets because none of the services are substitutes for each other; a patient seeking neonatology care, for example, will not turn

---

[7] The complaint describes the medical-services markets in greater detail. For example, Palmyra distinguishes the markets for medical services provided to privately insured patients from the markets for medical services provided to government-insured patients on the basis that hospitals receive significantly lower, nonnegotiable reimbursement rates for services provided to government-insured patients. Phoebe Putney disputes this differentiation. Because we do not decide whether Palmyra has stated a claim for relief sufficient to survive a motion to dismiss, this level of generality will suffice for purposes of this appeal.

instead to oncology care if the price is low enough.

Palmyra alleges that even though hospitals can provide the tying and tied services separately from each other, Phoebe Putney illegally tied purchase of the tied products to purchase of the tying products. In its negotiations with Blue Cross, for example, Phoebe Putney allegedly threatened to demand significantly higher reimbursement rates for the tying products if Blue Cross contracted with Palmyra for the tied products. Palmyra alleges that Phoebe Putney made the same threats during negotiations with CIGNA Health Care of Georgia, Inc.[8] Phoebe Putney negotiated a similar agreement with the local Public Employees' Plan, which ostensibly precludes that insurer from contracting with any hospital within 60 miles of Albany but then excepts several hospitals, leaving Palmyra as the primary hospital excluded. Palmyra alleges that Phoebe Putney generally pursued these tactics in negotiations with insurers even though Phoebe Putney offered no real discount in exchange for these insurers' refusals to deal with Palmyra. Nor, alleges Palmyra, do patients benefit from these contracts. In fact, patients have fewer choices for medical services, and Palmyra claims that the tying arrangements contribute to the region's higher-than-average healthcare costs.

Palmyra distills these allegations into six counts: Count I alleges that the

_____

[8] It is not clear whether these negotiations led to a contract.

tying arrangement constitutes a per-se violation of § 1 of the Sherman Act, 15 U.S.C. § 1; Count II alleges that the tying arrangement also constitutes a violation of § 1 of the Sherman Act under a rule-of-reason analysis; Count III alleges that the conduct amounts to monopolization as prohibited by § 2 of the Sherman Act, 15 U.S.C. § 2; Count IV alleges attempted monopolization under § 2 of the Sherman Act; Count V alleges tortious interference with Palmyra's business relations; and Count VI alleges that the defendants' conduct violates Article 3, § 6, Paragraph 5 of the Georgia Constitution and O.C.G.A. § 13-8-2, both of which prohibit contracts restraining competition. Palmyra seeks treble damages on its Sherman Act claims, injunctive relief preventing Phoebe Putney from contracting to exclude Palmyra from provider networks, and declaratory relief invalidating the existing contracts. The defendants moved the district court pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all of Palmyra's claims.[9]

In an order dated March 31, 2009, the district court granted the defendants' motions and dismissed Palmyra's complaint in its entirety. Addressing Palmyra's claims against the Hospital Authority, the court held that the complaint failed to allege any facts from which a conspiracy between the Hospital Authority and

---

[9] Phoebe Putney and its parent company Phoebe Putney Health Systems joined together in a single motion to dismiss. The Hospital Authority submitted its own motion to dismiss, but also adopted the other defendants' arguments.

Phoebe Putney could be inferred. It therefore dismissed Counts I through IV against the Hospital Authority.

The district court next turned to the claims against Phoebe Putney and its parent company, Phoebe Putney Health Systems, holding that Palmyra lacked antitrust standing to bring a damages action against them under § 4 of the Clayton Act, 15 U.S.C. § 15, or to seek injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26. Having found that Palmyra lacked antitrust standing to sue Phoebe Putney, the court did not address the question of whether, assuming that Palmyra had standing, it had stated a claim for relief under the antitrust laws.

The district court entered judgment for the defendants on Palmyra's antitrust claims on March 31, in conformance with its order entered earlier that day. Since the court had finally disposed of the federal claims in the case, it declined to exercise supplemental jurisdiction over Palmyra's state law claims and its judgment dismissed them without prejudice.

Palmyra timely appealed the district court's judgment.[10] In its briefs on appeal, Palmyra addresses only the issues related to its claims against Phoebe Putney and Phoebe Putney Health Systems, Inc., not those against the Hospital Authority. We accordingly treat Palmyra as abandoning its appeal of the judgment

---

[10] We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

for the Hospital Authority.

## II.

We review issues of antitrust standing <u>de novo</u>. <u>Fla. Seed Co. v. Monsanto Co.</u>, 105 F.3d 1372, 1374 (11th Cir. 1997). Section 4 of the Clayton Act creates a private right of action for "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," and allows that person to recover treble damages. 15 U.S.C. § 15(a). Read broadly, this provision would open the courts to entirely remote or speculative claims not in furtherance of the antitrust laws, so courts require parties to show that they are the proper plaintiffs to vindicate the public's interest in enforcing the antitrust laws. <u>See, e.g.</u>, <u>Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters</u>, 459 U.S. 519, 529, 103 S. Ct. 897, 904, 74 L. Ed. 2d 723 (1983) ("A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation."). Therefore, we also require a party to have antitrust standing.

To have antitrust standing, a party must do more than meet the basic "case or controversy" requirement that would satisfy constitutional standing; instead, the party must show that it satisfies a number of "prudential considerations aimed at preserving the effective enforcement of the antitrust laws." <u>Todorov v. DCH</u>

Healthcare Auth., 921 F.2d 1438, 1448 (11th Cir. 1991) (internal quotations omitted). We employ a two-prong test for antitrust standing under § 4 of the Clayton Act: first, the plaintiff must have alleged an antitrust injury, and second, the plaintiff must be an efficient enforcer of the antitrust laws. Id. at 1449.

> Antitrust injury is
>
> injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 697–98, 50 L. Ed. 2d 701 (1977) (quoting Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 125, 89 S. Ct. 1562, 1577, 23 L. Ed. 2d 129 (1969)) (alteration in original). The antitrust injury requirement ensures that the plaintiff, although motivated by private interests, is seeking to vindicate the type of injury to the public that the antitrust laws were designed to prevent. See Austin v. Blue Cross & Blue Shield of Ala., 903 F.2d 1385, 1389–90 (11th Cir. 1990).

In addition to showing antitrust injury, the plaintiff must be an efficient enforcer of the antitrust laws. In Associated General, the Supreme Court declined to articulate a bright-line rule and instead directed courts to consider a number of factors when deciding whether a plaintiff would be an efficient enforcer. 459 U.S.

12

at 536–37, 103 S. Ct. at 908. We reviewed these factors in <u>Todorov</u>: the directness or indirectness of the injury, the remoteness of the injury, whether other potential plaintiffs were better suited to vindicate the harm, whether the damages were highly speculative, the extent to which the apportionment of damages was highly complex and would risk duplicative recoveries, and whether the plaintiff would be able to efficiently and effectively enforce the judgment. 921 F.2d at 1451–52. We also made clear that other factors not identified by the Supreme Court might be relevant depending on the case. <u>Id.</u> at 1452. These factors are often intertwined, and no single factor will necessarily predominate over the others. <u>See</u> <u>Associated Gen.</u>, 459 U.S. at 537–46, 103 S. Ct. at 908–12 (discussing and applying the factors).

Section 16 of the Clayton Act allows any person to sue for injunctive relief "against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The antitrust standing inquiry under § 16 of the Clayton Act is less demanding than under § 4. Although the damages allowed by § 4 and the injunctive relief provided by § 16 are "complementary remedies for a single set of injuries," <u>Cargill, Inc. v. Monfort of Colo., Inc.</u>, 479 U.S. 104, 113, 107 S. Ct. 484, 491, 93 L. Ed. 2d 427 (1986), "courts are less concerned about whether the plaintiff is an efficient enforcer of the antitrust laws when the remedy is equitable

because the dangers of mismanaging the antitrust laws are less pervasive in [the § 16] setting." Todorov, 921 F.2d at 1452. Accordingly, a plaintiff seeking relief under § 16 must still allege an antitrust injury, just as the plaintiff would under § 4. Cargill, 479 U.S. at 113, 104 S. Ct. at 491. In this context, though, we are less concerned about whether the party would be the most efficient enforcer: "Because section 16 provides for injunctive relief, not treble damages, the risk of duplicative recovery or the danger of complex apportionment that pervades the analysis of standing under section 4 is not relevant to the issue of standing under section 16." Todorov, 921 F.2d at 1452. The takeaway, for purposes of this appeal, is that "if a plaintiff has standing to bring an antitrust action under section 4, he will also have standing under section 16." Id.

## A.

Before examining the district court's decision, we pause to discuss the market in which the parties operate and who would bear the costs of a tying arrangement like the one Palmyra alleges. Specifically, we examine how a hospital with market power in some markets could increase its profits, who bears the cost of those additional profits, and how those incentives affect the various parties' decisionmaking processes. Only after reviewing this dynamic can we determine whether Palmyra has antitrust standing.

14

In general, hospitals and insurance companies operate like any other business—they seek to maximize profits by increasing revenues and minimizing costs. For a hospital, those revenues come in large part from direct payments from patients, reimbursements from government-run insurance programs such as Medicare and Medicaid, and reimbursements from private insurers such as Blue Cross. Hospitals and private insurers negotiate the reimbursement rates that insurers will pay when the hospital treats an insured patient. If a patient receives treatment at an out-of-network hospital, the patient is usually responsible for paying much or all of the cost directly to the treating hospital. The reimbursement rates received from the government-run insurers—Medicare and Medicaid—are effectively fixed and non-negotiable and much lower than the rates paid by private insurers. Assuming that a hospital cannot change the government-paid reimbursement rates and that most patients do not choose to receive treatment from out-of-network providers because of the high out-of-pocket costs, a hospital can increase its revenues (and thus its profits) either by increasing the number of patients it serves or by increasing the reimbursements it receives from insurers.

To a private insurer, the reimbursement rates it pays to in-network hospitals make up a significant portion of its costs. The insurer's primary source of revenue

consists of the premiums paid by its policy holders.[11] Policy holders have several preferences when choosing insurance companies: policy holders generally prefer that their insurance companies offer in-network providers for the full spectrum of medical services, that they have more rather than fewer in-network providers from which to choose, and that they pay lower premiums. In light of these preferences, an insurance company must negotiate to set reimbursement rates with hospitals in a way that minimizes reimbursement rates (to offer policy holders low-enough premiums) while still enticing enough hospitals to join its network (to provide policy holders with sufficient choices).

In a competitive market for hospital services, a hospital's ability to demand higher reimbursement rates from insurance companies will be limited because an insurance company could always choose to contract with a different hospital so long as the insurance company could still offer its policy holders enough choices. These competitive pressures disappear if a hospital achieves market power for some services, as Palmyra alleges Phoebe Putney has in the markets for acute-care obstetrics and neonatology and cardiac catheterization laboratories.

---

[11] Alternatively, insurers can decrease their costs by requiring that their policy holders pay a higher percentage of the reimbursement rate in the form of higher co-payments. Both premiums and co-payments represent a cost incurred by the policy holders that offsets costs that would be borne by the insurer. For ease of discussion, we refer simply to "premiums," but we are cognizant that insurers could defray costs in other ways.

If a hospital is the only provider of services that an insurer considers indispensable—that is, the insurer must include a provider of those services in its provider network for policy holders to buy its insurance policies—then insurers will be captive to that hospital and at a significant disadvantage during reimbursement-rate negotiations. A hospital in this situation can leverage its position to increase profits beyond those it would otherwise earn in a competitive market in two ways. First, the hospital could demand a higher, monopoly reimbursement rate on the services over which it has market power while continuing to negotiate for reimbursement rates for the other services at the competitive level. Under this first option, the hospital would capture monopoly profits on only those services over which it has monopoly power; it would continue to face competitive pressures when negotiating reimbursement rates for the other medical services. So, the hospital captures additional profits, but only on the services over which it exercises monopoly power, and only at its existing number of patients. Instead, the hospital might turn to a second option: the hospital could leverage its market power over the monopolized services (the "tying products" or "tying services") to demand more favorable terms from insurers for the other medical services (the "tied products" or "tied services"). Palmyra alleges that Phoebe Putney pursued this second option by forcing its tying arrangement.

Under this second option, the hospital could both increase the number of patients it serves and increase somewhat the reimbursements it receives from insurers. The hospital would threaten to demand a significantly higher reimbursement rate for the tying products unless the insurer agrees to make the hospital the only (or primary) in-network provider for the tied products. Although the hospital might threaten any price, in reality it would not actually demand more than the monopoly reimbursement rate for the tying products because the monopoly reimbursement rate is the profit-maximizing rate for a monopolist; if the hospital demanded a higher rate than the monopoly rate, it would actually capture marginally fewer profits than it would at the monopoly rate. The insurers would recognize this, so the hospital's strongest credible threatened price would be the monopoly rate it would charge for the tying services standing alone.[12] The hospital could also demand higher reimbursement rates for the tied products, so long as the total cost presented to the insurers does not exceed the cost the insurers would face under the monopoly pricing scheme. If the insurer acquiesces to the tying arrangement, the insurer's policy holders—faced with the prospect of paying the

---

[12] Alternatively, the hospital could threaten to withhold the tying services altogether unless the insurer agreed to the tying arrangement. Conceptually, that is the same as demanding an infinitely high price. Either way, it would not be in the hospital's interest to refuse to deal with all insurers because the hospital would be forgoing the profits it could earn at the monopoly price. Thus, whether the hospital threatens to withhold the services entirely or just to charge a significantly higher price, its strongest credible threat is to charge the monopoly price.

entire cost of a procedure at any other hospital—would choose the monopolist hospital for the tied services even if they would otherwise have preferred a different hospital.

The tying arrangement would let the hospital capture additional profits in two ways. First, the hospital would capture the profits derived from the additional patients who would have selected another hospital if not for the exclusive tying arrangement. These profits would represent a direct transfer of wealth from the other hospitals to the tying hospital; these patients would still receive the same services, but their insurance companies would pay reimbursements to the tying hospital instead of the competing hospital. Thus, the other hospitals bear nearly the entire cost of this aspect of the tying arrangement; the insurance companies are indifferent because they do not care to which hospital they direct their reimbursements, and the patients suffer only to the extent that their ability to choose hospitals is curtailed. Second, by demanding somewhat higher reimbursement rates, the hospital would capture marginally higher profits on all patients it treats. Initially, the cost of these marginal profits earned above the competitive rate would fall on the insurance companies. But because the insurance companies all face the same deal from the tying hospital, they cannot compete with each other by reducing the reimbursement rates they pay (that is, no insurer could

undercut the others by reducing this cost because the cost is essentially fixed and the same to all insurance companies). Thus, they pass much of the cost of the marginally higher reimbursement rates directly to their policy holders in the form of higher premiums.

Faced with the choice between paying monopoly reimbursement rates for the services over which the hospital has monopoly power (that is, forcing the hospital to carry out its threat) or agreeing to the tying arrangement, an insurance company would consider its costs under both options. Whether the insurance company would face higher internalized reimbursement costs (that is, those costs it could not pass to its policy holders) under the monopoly or tying price would entirely depend on the actual empirical data. But the insurance company would not incur any additional costs if its policy holders had to go to one hospital instead of another—the insurer would simply disburse the same funds to the tying hospital that it would have directed to the other hospital. If the hospital sets its rates correctly, it could make the costs to the insurance companies of the tying arrangement just less than the costs under the threatened monopoly rate, thus inducing the insurance companies to agree to the tying arrangement and to effectively shift their policy holders from the competitors to the tying hospital.

Therefore, the tying hospital can take advantage of the interplay between

these incentives to increase its profits at the expense of its competitors. The insurance companies are the only parties that the hospital must convince to acquiesce in the tying arrangement, but the hospital can structure the tying arrangement so as to not significantly harm the insurance companies in the short run (or perhaps even make the insurance companies indifferent to the situation). Once the tie is in place, the insurance companies' policy holders will shift to the tying hospital from its competitors. The competitors, who bear the brunt of the cost of the hospital's increased revenue from its newly captured patients, are not part of the decisionmaking process.

Palmyra alleges results consistent with this tying behavior in its complaint: Phoebe Putney has market power in certain medical services markets, it leveraged that power to force Blue Cross (among other insurers) to exclude Palmyra from its provider network, shortly thereafter Palmyra lost its in-network status with Blue Cross, and Palmyra's revenues from treating Blue Cross policy holders subsequently dropped from $24 million to $6 million.

B.

With this dynamic and these consequences in mind, we turn to the heart of this appeal—whether Palmyra has antitrust standing to prosecute its claims against Phoebe Putney. We hold that it does.

21

1.

First, the above discussion shows that Palmyra's injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Brunswick Corp., 429 U.S. at 489, 97 S. Ct. at 697. In Brunswick, Pueblo Bowl-O-Mat, a local bowling alley, sued Brunswick, a national bowling equipment manufacturer and bowling alley operator, for violating § 7 of the Clayton Act, 15 U.S.C. § 18, by buying failing bowling alleys in the markets in which Pueblo operated (among other markets). Pueblo alleged that these failing alleys would have gone out of business had Brunswick not bought and continued to operate them and that Pueblo's market share would have increased accordingly. Id. at 479–81, 97 S. Ct. at 692–93. The Supreme Court denied Pueblo relief because, in reality, it was merely alleging that it faced stiffer competition, something that the antitrust laws were never designed to prevent. Id. at 488, 97 S. Ct. at 697 ("It is inimical to the purposes of [the antitrust] laws to award damages for the type of injury claimed here."). Similarly, in Todorov, we held that a radiologist seeking admission to a hospital's radiology department—which he alleged impermissibly tied the provision of CT scans to using certain radiologists preferred by the hospital administrators—failed to allege an antitrust injury because he was simply seeking to share in the supercompetitive profits being

22

earned by the preferred radiologists rather than to increase competition or to lower prices for consumers. 921 F.2d at 1453–55.

Here, by contrast, Palmyra's tying claims are the type of injury that the antitrust laws are designed to remedy, and the district court properly found so. Palmyra alleges that Phoebe Putney's exclusivity arrangements force insurers who would otherwise prefer to deal with both Phoebe Putney and Palmyra to instead deal with only Phoebe Putney. This prevents Palmyra from competing, as it previously did, in the market for the tied products. As a result, there is less competition for the tied products, which means higher prices and fewer choices for consumers. This is precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws. See, e.g., Mun. Utils. Bd. of Albertville v. Ala. Power Co., 934 F.2d 1493, 1500 (11th Cir. 1991) (finding an antitrust injury when an exclusive service-area arrangement limited the plaintiffs' "ability to compete for future customers by excluding them from territories where they formerly competed").

2.

The district court erred, though, by concluding that Palmyra is not an efficient enforcer of the antitrust laws. Applying the factors described at the beginning of part II, the district court first concluded that Palmyra's injuries were

indirect and remote:

> The most direct affect [sic] of Defendants' alleged anticompetitive conduct would be felt by the allegedly coerced insurers who pay higher reimbursement rates and the patients who ultimately pay higher premiums and co-pays for medical services. Plaintiff's alleged injury is peripheral to the harm allegedly done to these groups because Plaintiff merely seeks the opportunity to increases [sic] its profits.

(citations omitted). Based on this conclusion, the court then found that Palmyra's damages would be highly speculative because it would have to prove that it would be able to compete for in-network status, which "would require that Plaintiff be able to offer comparable quantity and quality of services to Defendant Phoebe's and the ability to challenge any pricing structure adopted by Defendant Phoebe." Finally, the court concluded that the insurance companies, the insurance companies' policy holders, and the government would all be better suited to enforce the antitrust laws in this situation, and that letting Palmyra pursue its claims created too great a risk of duplicative recovery.

The incentives at play revealed by our earlier discussion undermine the district court's decision; in fact, in a situation like this, a competitor like Palmyra is perhaps best suited to efficiently enforce the antitrust laws. Examining the factors highlighted in Associated General and Todorov in light of the relevant market dynamics reveals why.

The directness or remoteness of the injury are intertwined in this case, so we

begin by considering them together. It is true that several steps must occur before Palmyra suffers any injury due to the alleged tying arrangement: the insurance companies must first agree to the deal and deny Palmyra in-network status, and then their policy holders must choose to receive care at Phoebe Putney instead of Palmyra. Only then would Palmyra suffer a loss of revenue because of the tie. But once the insurer acquiesces to the tying arrangement, as Palmyra alleges Blue Cross and other insurers did, competitors such as Palmyra will almost certainly suffer the alleged injury—the cost of paying out-of-pocket for medical services is high enough that a rational Blue Cross policy holder would not usually select an out-of-network provider for services that would be covered by insurance at an in-network provider. And as the market description shows, Phoebe Putney's alleged tying arrangement only works if Blue Cross policy holders leave Palmyra for Phoebe Putney. Thus, although Palmyra's injury occurs several steps down the causal chain, once Phoebe Putney starts the ball rolling with its tying arrangement, Palmyra's injury all but inevitably follows.

Additionally, while Palmyra is, as the district court notes, "merely seek[ing] the opportunity to increase its profits," that is true of nearly every situation in which a competitor alleges an antitrust violation. Unlike the plaintiff in Todorov, who in essence was trying to use the antitrust laws to force his inclusion in a group

of preferred radiologists who were receiving supercompetitive profits, 921 F.2d at 1453–54, Palmyra is trying to gain access to the market for the tied services so that it can earn whatever profits it might otherwise earn in a competitive environment—Palmyra lacks the requisite CONs, so it could not possibly join Phoebe Putney in its alleged tying arrangement. This motivation is entirely consistent with increasing competition; competitors would never seek to enter a market if they did not think they could earn profits. Indeed, Congress relied on a business's motivation to earn profits when enacting the private-enforcement provisions of the antitrust laws. See, e.g., Lehrman v. Gulf Oil Corp., 500 F.2d 659, 667 (5th Cir. 1974) ("The prospect of a damage award multiplied three-fold should provide an incentive for private parties to instigate costly and uncertain litigation, thus supplementing Governmental enforcement.").[13]

Next, Palmyra has a strong incentive to sue and is thus well suited to vindicate the alleged antitrust harm—and probably better suited than the other parties identified by the district court. The parties that the district court identified as better suited to vindicate the harm actually have relatively little incentive to sue Phoebe Putney or face steep obstacles to doing so. As explained above, the

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

insurance companies are likely able to pass a large percentage of the higher reimbursement rates on to their policy holders in the form of higher premiums. Thus, they bear relatively little of the cost imposed by the tying scheme. Moreover, an insurance company would risk losing its goodwill with Phoebe Putney if it sued; given that an insurer must include Phoebe Putney in its network to be competitive in southwest Georgia, insurers would be understandably reluctant to anger Phoebe Putney by suing it.

Although the insurance companies' policy holders would likely suffer harm in the form of higher premiums and decreased choices—two evils within the ambit of the antitrust laws—they too are relatively unlikely to sue. Because the insurers would be able to spread their increased costs across all of their policy holders, any given policy holder would see only a small increase in premiums; a policy holder is unlikely to prosecute a costly and time-consuming federal antitrust suit to recover an insubstantial sum, even if the policy holder could receive treble damages. Moreover, certifying a class would be difficult because of the individualized nature of the damages calculations—many factors unique to the individual influence a person's insurance premiums, making it difficult to isolate how much of each person's premium is a result of the tying arrangement—and managing a class action might prove unwieldy. Finally, the district court indicated that the

government would also be better situated to vindicate any harm to the public because the government is charged with protecting the public interest. Although the government may in principle have this obligation, the very fact that Congress created a private right of action under the antitrust laws belies this argument. Perhaps one might conceive of some antitrust violation so complex or harm so dispersed that only the government would be able to properly administer a lawsuit, but that is not this case. The government has limited resources with which to uncover and prosecute antitrust violations, which is precisely why Congress created a private right of action with treble damages as an incentive. As Phoebe Putney's chief competitor, Palmyra is undoubtedly well suited to vindicate these harms.

Nor are Palmyra's damages highly speculative. As already explained, a tying arrangement would let Phoebe Putney increase profits in two ways: by demanding higher reimbursement rates and by capturing more patients for the tied services from its competitors. Because Palmyra is Phoebe Putney's only major competitor for the tied services, most of Phoebe Putney's new patients would be diverted from Palmyra, depriving it of revenue. Thus, Palmyra's damages are not overly speculative because any successful tying arrangement Phoebe Putney might have imposed would necessarily harm Palmyra. Nor does the fact that Palmyra

would have to prove that it could compete with Phoebe Putney render Palmyra's damages highly speculative, as the district court was concerned. Palmyra alleges in its complaint that it is prepared to competitively provide the tied services. Moreover, Palmyra's complaint implies that Palmyra already provides the tied services to Medicare and Medicaid patients, and Palmyra states that it did compete with Phoebe Putney in the tied services markets as an in-network provider for Blue Cross before Phoebe Putney imposed its alleged tying arrangement.

Likewise, allowing Palmyra to sue does not create problems apportioning damages or risk duplicative recoveries—Palmyra's damages flow directly from the diverted patients, and it alone would suffer these damages. In fact, it would be much more difficult to apportion any damages caused by increased reimbursement rates because that would require determining how much of the rate increase was due to the tying arrangement, how much of the rate increase the insurance companies absorbed, how much of the increase they passed on to their policy holders in the form of higher premiums, and how much of any given policy holder's increased premium was a result of the tying arrangement as opposed to that policy holder's personal health characteristics. Apportioning Palmyra's damages would be comparatively straightforward. The court would have to determine how many patients were diverted from Palmyra to Phoebe Putney due to

the tying arrangement and how much Palmyra would have been reimbursed for the services it would have performed.[14]  And Palmyra alone would suffer this harm, eliminating any concerns about apportionment or duplicative recoveries.

Lastly, Palmyra would certainly be able to efficiently and effectively enforce any judgment it obtained against Phoebe Putney.  Palmyra is a large hospital with significant financial and legal resources as well as a strong incentive to recoup its allegedly lost profits.  Moreover, as a single plaintiff, Palmyra faces none of the logistical difficulties or diluted incentives that would, for example, hinder a class representative seeking to enforce a judgment in favor of a class of insurance policy holders.

In sum, considering the dynamics of the market in which the parties operate reveals that Palmyra is an efficient enforcer of the antitrust laws and is a proper party to seek redress from Phoebe Putney for its alleged antitrust injuries.[15]  In

---

[14]  This is not to say that the damages determination would be easy.  Indeed, the district court would still have to determine the extent to which Palmyra's decrease in patients was attributable to Phoebe Putney's conduct, but this is much closer to the type of determinations courts routinely make in business litigation.

[15]  Perhaps anticipating an adverse holding on the antitrust standing issue, Phoebe Putney asks us to affirm the district court's judgment on the alternative ground that Palmyra failed to state a claim for relief under Fed. R. Civ. P. 12(b)(6).  Although we may affirm a judgment on any legal ground, Cuddeback v. Fla. Bd. of Educ., 381 F.3d 1230, 1235–36 (11th Cir. 2004), we likewise may exercise our discretion to decline to do so when appellate review would benefit from reasoned deliberation by the district court, see, e.g., La Grasta v. First Union Sec., Inc., 358 F.3d 840, 851 (11th Cir. 2004) (declining to reach the issue of whether a complaint in a securities-fraud case adequately pleaded loss causation and remanding the case to the district court for initial consideration because the district court dismissed the complaint on a different

other words, Palmyra has antitrust standing to pursue its claims against Phoebe Putney under § 4 of the Clayton Act. Because Palmyra has antitrust standing under § 4, it also satisfies the less demanding antitrust standing test required to seek injunctive relief against Phoebe Putney under § 16 of the Clayton Act. See Todorov, 921 F.2d at 1452 ("[I]f a plaintiff has standing to bring an antitrust action under section 4, he will also have standing under section 16.").

III.

For the foregoing reasons, we REVERSE the district court's judgment entered on March 31, 2009, as to Palmyra's claims against Phoebe Putney and Phoebe Putney Health Systems, and REMAND the case to the district court for further proceedings consistent with this opinion.

SO ORDERED.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

ground). In this case, we think appellate review of whether Palmyra adequately pleaded a claim for relief would benefit from initial consideration by the district court.

# UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT
## BILL OF COSTS

Palmyra Park Hospital, Inc., d/b/a Palmyra
Medical Center

**Appellant**

vs.

Phoebe Putney Memorial Hospital, Inc., Phoebe
Putney Health System, Inc. & Hospital Authority of
Albany/Dougherty County **Appelles**

Appeal No. 09-11818-HH

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 10 2010
OHNLEY
CLERK

Fed.R.App.P. 39 and 11th Cir. R. 39-1 (see reverse) govern costs which are taxable in this court and the time for filing the Bill of Costs. A motion for leave to file out of time is required for a Bill of Costs not timely received.

## INSTRUCTIONS

In the grid below, multiply the number of original pages of each document by the total number of documents reproduced to calculate the total number of copies reproduced. Multiply this number by the cost per copy ( $.15 per copy for "In-House", up to $.25 per copy for commercial reproduction, supported by receipts) showing the product as costs requested.

| DOCUMENT | Repro. Method (Mark One) In-House | Comm* | No. of Original Pages | Total No. Documents Reproduced | | Total No. of Copies | COSTS REQUESTED | CT. USE ONLY COSTS ALLOWED |
|---|---|---|---|---|---|---|---|---|
| Appellant's Brief | X | | 61 | (9) | 15 | 915 | 137.25 | 82.35 |
| Record Excerpts | X | | 263 | (7) | 13 | 3,419 | 512.85 | 276.15 |
| Appellee's Brief | | | | | | | | |
| Reply Brief | X | | 41 | (9) | 16 | 656 | 98.40 | 55.35 |
| Supplemental Br | X | | 23 | (9) | 16 | 368 | 55.20 | 31.05 |

| *Note: If reproduction was done commercially, receipt(s) must be attached. | **TOTAL** | $ 803.70 REQUESTED | $ 444.90 ALLOWED |
|---|---|---|---|

I hereby swear or affirm that the costs claimed were actually and necessarily incurred or performed in this appeal and that I have served this Bill of Costs on counsel/parties of record.

Date Signed: 5/5/2010

Attorney for: Palmyra Park
(Type or print name of client)

Signature: _James Scott Ballenger_

Attorney Name: James Scott Ballenger
(Type or print your name)

---

### FOR COURT USE ONLY

Costs are hereby taxed in the amount of $ $444.90 against **Appellee**

and are payable directly to **Appellant**

JUN 0 1 2010

Issued on: _____

Thomas K. Kahn, Clerk

By: _____
Deputy Clerk

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

MISC-12
(12/07)

FRAP 39. Costs

(a) **Against Whom Assessed.** The following rules apply unless the law provides or the court orders otherwise:

    (1)  if an appeal is dismissed, costs are taxed against the appellant, unless the parties agree otherwise;

    (2)  if a judgment is affirmed, costs are taxed against the appellant;

    (3)  if a judgment is reversed, costs are taxed against the appellee;

    (4)  if a judgment is affirmed in part, reversed in part, modified, or vacated, costs are taxed only as the court orders.

(b) **Costs For and Against the United States.** Costs for or against the United States, its agency, or officer will be assessed under Rule 39(a) only if authorized by law.

(c) **Costs of Copies.** Each court of appeals must, by local rule, fix the maximum rate for taxing the cost of producing necessary copies of a brief or appendix, or copies of records authorized by Rule 30(f). The rate must not exceed that generally charged for such work in the area where the clerk's office is located and should encourage economical methods of copying.

(d) **Bill of Costs; Objections; Insertion in Mandate.**

    (1)  A party who wants costs taxed must — within 14 days after entry of judgment — file with the circuit clerk, with proof of service, an itemized and verified bill of costs.

    (2)  Objections must be filed within 10 days after service of the bill of costs, unless the court extends the time.

    (3)  The clerk must prepare and certify an itemized statement of costs for insertion in the mandate, but issuance of the mandate must not be delayed for taxing costs. If the mandate issues before costs are finally determined, the district clerk must — upon the circuit clerk's request — add the statement of costs, or any amendment of it, to the mandate.

(e) **Costs on Appeal Taxable in the District Court.** The following costs on appeal are taxable in the district court for the benefit of the party entitled to costs under this rule:

    (1)  the preparation and transmission of the record;

    (2)  the reporter's transcript, if needed to determine the appeal;

    (3)  premiums paid for a supersedeas bond or other bond to preserve rights pending appeal; and

    (4)  the fee for filing the notice of appeal.

\* \* \* \*

11th Cir. R. 39-1 Costs. In taxing costs for printing or reproduction and binding pursuant to FRAP 39(c) the clerk shall tax such costs at rates not higher than those determined by the clerk from time to time by reference to the rates generally charged for the most economical methods of printing or reproduction and binding in the principal cities of the circuit, or at actual cost, whichever is less.

Unless advance approval for additional copies is secured from the clerk, costs will be taxed only for the number of copies of a brief and record excerpts or appendix required by the rules to be filed and served, plus two copies for each party signing the brief.

All costs shall be paid and mailed directly to the party to whom costs have been awarded. Costs should not be mailed to the clerk of the court.

\* \* \* \*

*I.O.P. -*

*1. Time - Extensions. A bill of costs is timely if filed within 14 days of entry of judgment. Judgment is entered on the opinion filing date. The filing of a petition for rehearing or petition for rehearing en banc does not extend the time for filing a bill of costs. A motion to extend the time to file a bill of costs may be considered by the clerk.*

*2. Costs for or Against the United States. When costs are sought for or against the United States, the statutory or other authority relied upon for such an award must be set forth as an attachment to the Bill of Costs.*

*3. Reproduction of Statutes, Rules, and Regulations. Costs will be taxed for the reproduction of statutes, rules, and regulations in conformity with FRAP 28(f). Costs will not be taxed for the reproduction of papers not required or allowed to be filed pursuant to FRAP 28 and 30 and the corresponding circuit rules, even though the brief, appendix, or record excerpts within which said papers are included was accepted for filing by the clerk.*